The Parkinson Sugar Company and John R. Kearns v. The Bank of Fort Scott and Allan Wheeler, *as Sheriff*, etc.

No. 11064.

1. Corporations—*Purposes.* Under our statute a corporation may be organized for the transaction of any manufacturing, mechanical or mercantile business, either separately or all combined.

2. ———— *Charter Construed—Sugar Company.* A corporation whose powers and purposes, as declared in its charter, were the manufacture of sugar, syrup, starch, and glucose, the erection and maintenance of a factory, and the purchase and sale of real estate and plantations therefor, the purchase, location and laying out of town sites and the sale and conveyance of the same in town lots, and "for the transaction of manufacturing, mechanical and mercantile business," is authorized to establish and carry on the business of manufacturing matches and woodenware, in addition to the manufacture of sugar, syrup, starch, and glucose.

3. ———— *Free from Fraud—Mortgages Held Valid.* The testimony examined, and held sufficient to sustain the finding of the court that the action of the officers in establishing and carrying on the additional industry was free from fraud, and that the mortgages upon which money was obtained for the purposes named were executed in good faith and are binding obligations of the company.

Error from Allen district court; L. Stillwell, judge. Opinion filed May 6, 1899. Affirmed.

*Perry & Crain*, and *Keene & Gates*, for plaintiffs in error.

*Hulett & Hulett*, *C. E. Benton*, and *J. D. McCleverty*, for defendants in error.

The opinion of the court was delivered by

Johnston, J.: On July 17, 1895, the Parkinson Sugar Company borrowed $10,000 from the Bank of Fort Scott. The debt was represented by two notes

of $5000 each, due in six and twelve months, and the payment of the same was secured by a mortgage on the property of the sugar company. On October 8, 1895, the sugar company borrowed an additional $5000 and gave the bank its note payable in six months thereafter, secured by a mortgage on the company's property. Default having been made in the payment of the notes and mortgages, a foreclosure proceeding was begun on August 5, 1896, and in September following it resulted in a judgment against the sugar company for $15,870.18. Soon afterward an order of sale was issued on the judgment, but before the sale was made John R. Kearns, a stockholder of the sugar company, instituted this action to enjoin the sale, alleging that the notes and mortgages were executed without authority, and in fraud of his rights, and that the bank had full knowledge of the facts and of such invalidity. Subsequently the sugar company intervened in the action and reiterated the charges of fraud, want of authority, and invalidity. A temporary injunction was obtained at the beginning of the proceedings, but on the trial the injunction was dissolved and judgment given to the defendants. Complaint is made that the facts do not warrant the judgment of the court. Although a great mass of testimony was received, much of which was conflicting, only a general finding of the court was made, and therefore, on the disputed questions, the controversy must be deemed to be closed.

It appears that the sugar company was organized in 1886, and the purpose and powers of the company, as declared in the charter, were these :

"The manufacture of sugar, syrup, starch, grape sugar, glucose and other products from sorghum, cane, cane seed, corn and other saccharine and amylaceous

substances ; for the erection and maintenance of factories and the purchase and sale of real estate and plantations therefor ; for the purchase, location and laying out of town sites and the sale and conveyance of·the same in town lots and subdivisions or otherwise, and for the transaction of manufacturing, mechanical and mercantile business.''

For a number of years the operations of the company were mainly confined to the manufacture of sugar and syrup, but as this business was necessarily limited to the cane season, only a small part of the year, the extension of their manufacturing operations became a subject of discussion among the stockholders and officers of the company. At the January, 1895, meeting of the stockholders the directors were instructed to examine into the matter of adding a match factory and a veneer wood-working establishment to the company's plant, and, if it should be deemed desirable that such industry be added to the company's business, the directors were authorized to borrow $10,000,.and to secure the loan they were authorized to mortgage the real estate of the company. On March 13, 1895, a committee was appointed by the`board of directors to visit Chicago and investigate the business of making matches, but before the committee had gone, and on March 15, the action of the board in appointing the committee was revoked and the directors determined to proceed at once to construct the match factory and the veneer wood-working establishment, which was done. At the July meeting of the board a resolution was adopted to borrow $10,-000 to pay certain mortgage indebtedness existing against the company and to complete the match and veneer wood-working plant, which was in process of construction. In pursuance of this resolution the two notes already mentioned, of $5000 each, dated July

17, 1895, were executed, as well as a mortgage to secure their payment. The testimony tends to show that a mortgage debt of the company to the extent of $7000, contracted before the new enterprise was entered upon, was paid out of the $10,000 loan obtained from the Bank of Fort Scott. Later in the year, and when the company had overdrawn its account with the Bank of Fort Scott, another mortgage loan of $5000 was obtained, as we have seen, from the same bank. The notes and mortgage are the basis of the foreclosure judgment, and that the amount of the loans was actually paid to and expended in the interest of the company is well established. The construction of the new industry and the addition of the same to the company's plant were well known to the officers and to most of the stockholders of the company long before the notes and mortgages in question matured or the judgment of foreclosure was rendered. Indeed, the parties complaining were generally informed of the operations of the company from the beginning, but no steps were taken to prevent the carrying out of the project until the present proceeding was begun.

The first attack made upon the judgment of foreclosure is that the charter of the company did not warrant the manufacture of matches and woodenware, and that the obligations created for this purpose were unauthorized, and therefore invalid. The purposes for which a corporation is formed are required to be set forth in its charter, and we look to this declaration, as well as to the general law under which it was organized, to determine the nature and extent of its corporate powers and privileges. These constitute the measure of its authority, and it can exercise no other powers than those expressly or impliedly conferred by the charter. From the declared purposes

already quoted from the charter, it will be seen that the scope of the purposes and powers of the company was not restricted to one line of business or to the manufacture of a single product.   It was authorized not only to manufacture sugar and syrup, but to erect and maintain factories, to purchase and sell real estate and plantations therefor, and to purchase, locate and lay out town sites and to dispose of town lots. While the latter provisions may be regarded as incidental to the manufacture of sugar and syrup, the incorporators expressly added a provision authorizing "the transaction of manufacturing, mechanical and mercantile business."   Manifestly it was intended to enlarge the scope and extent of the powers of the company by this declaration, and no reason is seen why it cannot be given effect.   Nothing in the statute under which the corporation was formed limits it to the manufacture of a single article or product.   On the other hand, our law is exceedingly liberal in allowing a combination of the lines of business which may be carried on by a single corporation.   It authorizes "the transaction of any manufacturing, mining, mechanical, chemical, or mercantile and agricultural implements and produce business, either separately or all combined."   (Gen. Stat. 1897, ch. 66, § 4; Gen. Stat. 1889, ¶ 1157.)   Under the broad and liberal provisions of the statute and charter, it cannot be held that the new industry is outside of the charter powers of the company.

It is next contended that the officers of the company acted fraudulently and in excess of the authority given by the stockholders.   In the state of the record, questions of bad faith and fraud are hardly open to review in this court.   Much of the testimony tended to show good faith and honesty in the transaction of the busi-

ness, and we find little that supports the charge of conspiracy to "freeze out" the interest of Kearns or to wreck the corporation.   No special findings of fact were asked or made, and it must be held that the general finding settles the controverted questions of fact in favor of the defendants.   Authority to add the new industry, and to provide money with which to pay for the same, was given, as we have seen, at the stockholders' meeting of January, 1895.   Those who are now complaining joined in conferring that authority on the directors.   It is true a question has been raised as to whether such authority included the manufacture of woodenware, but from the testimony and finding of the trial court we are bound to hold that it was included.   It may be that the project was impracticable and visionary, and that it was unsuccessful in operation seems to be conceded, but that is no reason why the company should repudiate its contracts and obligations made and assumed in carrying it out, nor any reason why the plaintiff Kearns should defeat the enforcement of a judgment based on such contracts and obligations.   The project was not only undertaken with the authority of the stockholders, but it was openly carried on before the eyes of all interested parties, and, besides, it appears that the action of the directors was approved at the stockholders' meeting held in 1896.   At that time the new industry had been started, machinery for making matches and woodenware had been purchased, and the money to pay for the same had been expended. The complaining parties had knowledge of the building and carrying on of the new industry as it progressed, and also that it was done with borrowed money.   From this expenditure the company has acquired considerable property, which it retains, and

some of it has been disposed of for the benefit of the company. In the absence of fraud, it cannot receive and retain the fruits of a contract and then repudiate its obligation arising on the same. It cannot borrow money for a manufacturing experiment and shake off the obligation because it was unsuccessful.

There is a claim that more money was expended for the purpose named than was authorized by the stockholders. It is true that the mortgage debt is greater than the amount authorized to be used in establishing the new industry, but the testimony shows that a large part of the money derived from the mortgage was used to pay the ordinary expenses of the company growing out of the manufacture of sugar and syrup, and that much less than $10,000 of the money borrowed from the bank was expended in establishing a factory for making matches and woodenware. In any event, the parties complaining are not in a position to invoke the application of the doctrine of *ultra vires*. (*Town Co. v. Morris*, 43 Kan. 282, 23 Pac. 569; *Town Co. v. Russell*, 46 id. 384, 26 Pac. 715; *Railroad Co. v. Johnson*, 58 id. 175, 48 Pac. 847.)

The judgment of the district court will be affirmed.